GEORGE W. SABRE ET AL. *v.* RUTLAND RAILROAD COMPANY AND
CENTRAL VERMONT RAILWAY COMPANY.

Special Term, December, 1912.

Present: MUNSON, WATSON, HASELTON, and POWERS, JJ., and BUTLER,
Superior Judge.

Opinion filed January 21, 1913.

*Railroads—Protection of Grade Crossings—Dangerous Approach
to Station—Jurisdiction of Public Service Commission—
P. S. 4433—Consulting Expert · after Hearing—Effect—
Powers and Status of Public Service Commission—Consti-
tutionality of P. S. 4591-4614—Separation of Governmental
Powers—Delegation of Legislative Powers—Police Power—
Common Law Remedies of Parties Aggrieved by Orders of
Administrative Bodies.*

P. S. 4433 does not give the Public Service Commission authority to
order gates to be constructed, maintained, and operated at a
railroad-highway crossing at grade outside of villages or cities
merely because of the situation created by such crossings.

On appeal from an order of the Public Service Commission, the ap-
pellant may raise the question of the sufficiency of the evidence to
support the findings.

A railroad corporation is under obligation to make the surroundings
and approaches to its stations reasonably safe, and the statute
confers on the Public Service Commission authority to enforce
that obligation, and so it may order the construction, maintenance,
and operation of gates at a dangerous railroad-highway crossing
at grade that is only four or five rods from an important passenger
station, and must be traversed in approaching it.

An order of the Public Service Commission directing the construction,
maintenance, and operation of gates at a railroad-highway crossing
at grade, though made on proper petition and after due notice
and hearing thereon, will be set aside on appeal where it appears
that, after the hearing, the Commission employed an expert who

made investigations and reported the result thereof to the Commission, who considered the report in arriving at their conclusions, and no opportunity was given the appellant either to examine the expert, to present evidence in rebuttal, or to argue the case as it finally stood.

The constitutional requirement that the three departments of government shall be kept separate does not mean an absolute separation of functions, for that would paralyze government.

Although the supreme legislative power cannot be delegated, there are many powers so far legislative that the Legislature may properly exercise them, which can be delegated.

The functions of an administrative officer, or body, may be to a large extent judicial and regulative in character.

The settled policy of the State in legislating on the subject-matter of a statute is to be regarded in construing it, and its cardinal purpose should control in construing its minor provisions.

Under P. S. 4591-4614, as amended by No. 116, Acts 1908, the Public Service Commission is not in the strict sense a court, but is an administrative body with quasi-judicial functions and auxiliary, or subordinate, legislative powers, and authorized in the exercise of the police power to make rules and regulations required by public safety and convenience, and to determine facts on which existing laws shall operate.

When it is reasonably possible to do so, a statute should be so construed as to make it constitutional.

In construing a statute it is strongly to be presumed that the purpose of the Legislature was a constitutional one.

The term "the police power" denotes sovereignty itself rather than a mere attribute thereof, and connotes the power to provide for the public safety and convenience as well as to protect the public health and the public morals.

The State cannot divest itself of its right and duty under the police power, nor can the Federal Government, except by some authority conferred by the Constitution of the United States, interfere with the exercise of that power by a state.

By virtue of Chap. 1, Art. 1, of our State Constitution the Legislature may provide for the exercise of visitatorial and police powers to secure compliance with laws enacted under the general reserved powers never surrendered to the Federal Government.

Though the Legislature cannot delegate its strictly and purely legislative functions, yet, having by general law and charters made

valid provisions applicable to railroad corporations, it may confer on the Public Service Commission power upon investigation to apply the general provisions of law to particular circumstances.

A statute conferring on a board the power to make rules and regulations in furtherance of the police power will be interpreted as conferring only the power to make reasonable rules and regulations, and whether such rules and regulations are of that quality is a strictly judicial question of which the courts must take cognizance, regardless of whether the statute provides for proceedings in that respect.

If by P. S. 4591-4614, as amended by No. 116, Acts 1908, creating the Public Service Commission and defining its powers, any powers are conferred on that Commission which cannot be given to an administrative body because of the constitutional provision that the departments of government be kept separate, as the power to enforce its orders "by any suitable process issuable by courts of law or equity in this State," such powers do not render the statute as a whole unconstitutional, for in the light of the history of legislation on this subject-matter, and from the statute itself, it is to be presumed that the Legislature would have passed the constitutional part of the statute without the unconstitutional part.

Nor is the statute void on the ground that, for want of a provision for an adequate judicial review of the orders of the Commission they are in violation of the provisions of our State Constitution and of the Federal Constitution prohibiting the taking of property without due process of law, for the powers given by the statute to this Court on appeal from an order of the Commission, and the common law remedies for the protection of rights that cannot be safeguarded by means of the hearing and appeal provided for by the statute, are sufficient to protect parties from all acts of the Commission in excess of authority.

Under §4, Chap. 2 of our Constitution, providing that, "The courts shall be open for the trial of all causes proper for their cognizance," the rights of a party aggrieved by an order of an administrative body such as the Public Service Commission are not confined to what he may secure by an appeal, but by a proper common law proceeding the question of whether an administrative body has exceeded its powers may be brought before and determined by the established courts, and no procedure need be specially provided for that purpose, for the common law, which is part of the law of this State, provides the machinery.

APPEAL from an order of the Public Service Commission directing the construction, maintenance, and operation of gates at a grade crossing near the passenger station at Alburgh. The opinion states the case.

*Edwin W. Lawrence* for the appellant.

All laws relating to the Public Service Commission, and particularly P. S. 4611, are unconstitutional because legislative, executive, and judicial functions are conferred on the Commission and hopelessly commingled, in violation of our State Constitution; and because those laws deny a full judicial review of the commissioners' orders, making its findings of facts final, whereby such orders take property without due process of law. *State* v. *Johnson,* 61 Kan. 811; *Kilbourn* v. *Thompson,* 103 U. S. 190; *Town of Searsburg* v. *Town of Woodford,* 76 Vt. 370; *Stearns* v. *City of Barre,* 73 Vt. 281; *Bacon* v. *B. & M. R.,* 83 Vt. 421; *Minnesota* v. *Great Northern Ry. Co.,* 100 Minn. 445, 10 L. R. A. (N. S.) 250; *State ex rel. Hahn* v. *Young,* 29 Minn. 474; *Monongahela Bridge Co.* v. *U. S.,* 216 U. S. 177; *Union Bridge Co.* v. *U. S.,* 204 U. S. 364, and cases therein cited; *Buttfield* v. *Stranahan,* 192 U. S. 472, and cases therein cited; *State* v. *Speyer,* 67 Vt. 502; *Railroad Commission Cases,* 116 U. S., 307; *Chicago etc. Railway* v. *Minnesota,* 134 U. S. 418; *Chicago etc. Railway* v. *Wellman,* 143 U. S. 339; *Reagan* v. *Farmers' L. & T. Co.,* 154 U. S. 362; *Lake Shore etc. Ry. Co.* v. *Smith,* 173 U. S. 684; *Smyth* v. *Ames,* 169 U. S. 466; *Chicago etc. Ry.* v. *Tompkins,* 176 U. S. 167; *Wisconsin etc. Co.* v. *Jacobson,* 179 U. S. 287; *Oregon R. R. & N. Co.* v. *Fairchild,* 224 U. S. 510; *Louisiana etc. Railway* v. *State,* 85 Ark. 12; *Brown* v. *Kalamazoo,* 75 Mich. 274.

The order is void because, after the hearing, without notice to appellant and an opportunity to examine the witness, or present evidence or argument in defence, the commission employed an expert, who made an investigation, and whose report the commission considered in making the findings. *Louisville etc.* v. *Interstate Commerce Commission,* 195 Fed. 541; *Missouri Pacific Ry.* v. *Nebraska,* 217 U. S. 196; *In re Allen,* 82 Vt. 365; *Quimby* v. *Hazen,* 54 Vt. 132.

*John G. Sargent,* Attorney General, and *George L. Hunt* for the appellee.

The laws in question are not void as conferring on the Public Service Commission purely legislative, executive, and judicial powers.   There is no absolute line separating the functions of those three departments, and their strict separation is impossible.   Federalist, No. XLVII, pp. 303-308; 1 Story Const., §§525, 540, 541; *Re Trustees Saratoga Springs* v. *Saratoga Gas etc. Co.,* 191 N. Y. 123; *State ex rel.* v. *Bates,* 96 Minn. 110; *State ex rel. Oregon etc. Co.* v. *Railroad Commission of Washington,* 100 Pac. 179; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Wayman* v. *Southard,* 10 Wheat. 1.

The power given the commission is merely to act under existing laws, not to make laws, and so no purely legislative functions are delegated in violation of our State Constitution.   *State* v. *Frear,* (Wis.) 131 N. W. 832; *State* v. *Chittenden,* 107 N. W. 500; *Slack* v. *M. etc. R. R. Co.,* 13 B. Mon. 23; *Michigan Central R. R. Co.* v. *Michigan R. R. Commission,* 125 N. W. 549; *Gulf etc. Ry. Co.* v. *State,* (Tex.) 120 S. W. 1028; *Borgnis* v. *Falk Co.,* 133 N. W. 209; *Railroad Commission of Alabama* v. *Central of Georgia Ry. Co.,* 170 Fed. 225; *State ex rel. Webster* v. *Superior Court of King County,* 120 Pac. 861; *Southern Railway Co.* v. *Melton,* (Ga.) 65 S. E. 665; *Zuber* v. *Southern Railway Co.* (Ga.) 71 S. E. 937; *Merchants of St. Louis* v. *Knott,* (Mo.) 11 S. W. 565; *In re Oliver,* 17 Wis. 681; *France* v. *State,* 57 Ohio 1; *State* v. *Hathaway,* 115 Mo. 36; *N. Y. Life Ins. Co.* v. *Hardison,* 199 Mass. 190; *State ex rel. No. Pac. Ry. Co.* v. *Railroad Commission,* (Wis.) 121 N. W. 919; *Brig Aurora,* 7 Cranch. 382; *Field* v. *Clark,* 143 U. S. 649; *Cincinnati etc. R.* v. *Commissioners,* 1 Ohio 77; *Morer* v. *City of Reading,* 121 Pa. St. 188; *Locke's Appeal,* 72 Pa. St. 491; *Buttfield* v. *Stranahan,* 192 U. S. 469; *Chatfield Co.* v. *City of New Haven,* 110 Fed. 788; *Chicago etc. Ry. Co.* v. *Dey,* 35 Fed. 866; *State ex rel. Milwaukee Medical College* v. *Chittenden,* 127 Wis. 468; *State ex rel. Granville* v. *Gregory,* 83 Mo. 123; *State ex rel. Powell* v. *State Med. Exam. Board,* 32 Minn. 324; *South Indiana Ry. Co.* v. *Railroad Commission of Indiana,* (Ind.) 87 N. E. 966; *Southern Pacific Co.* v. *Bartine,* 170 Fed. 725; *Grand Trunk Western Ry. Co.* v. *South Bend,* 91 N. E. 800; *Gulf Compress Co.* v. *Harris, Cortner &*

*Co.,* 48 So. 477; *In re Arkansas Railroad Rates,* 168 Fed. 720; *Louisville etc. Co.* v. *Interstate Commerce Commission,* 184 Fed. 118; *Gray* v. *McLendon,* 67 S. E. 859; *Farm Investment Co.* v. *Carpenter,* 87 Am. St. Rep. 918; *Georgia Railroad* v. *Smith,* 70 Ga. 694; *Gibbs* v. *Aldermen,* 99 Ky. 490; *Feek* v. *Township Board,* 82 Mich. 393; *Hymes* v. *Hydelott,* 26 Ind. 431; *People* v. *Kipley,* 171 Ill. 44.

In *Ex rel. Layton* v. *Mo. Pac. Ry. Co.,* 76 Kan. 467, that court has departed from *State* v. *Johnson,* 61 Kan. 811, relied on by appellant.

Notwithstanding the constitutional separation of powers, many duties of government, not inherently related to any one department, may under the constitution be discharged in any mode provided by law. *Palmyra* v. *Pa. Railroad Co.,* 62 N. J. Eq. 601; *Paul* v. *Gloucester County,* 50 N. J. L. 585; *Brown* v. *Turner,* 70 N. C. 102; *People* v. *Hurlbutt,* 24 Mich. 44; *Ross* v. *Essex,* 69 N. J. L. 291; *Hopson's Appeal,* 65 Conn. 140; *C. V. Ry. Co.* v. *Hartford,* 82 Vt. 145; *Norwood* v. *N. Y. & N. E. R. Co.,* 162 Mass. 564; *Stanley* v. *Old Colony R. Co.,* 176 Mass. 145; *Salem Turnpike etc. Co.* v. *Essex County,* 100 Mass. 282; *Dow* v. *Wakefield,* 103 Mass. 267; *Woodruff* v. *N. Y. & N. E. R. Co.,* 59 Conn. 63; *Eckert* v. *Perth Amboy etc. Ry. Co.,* 66 N. J. Eq. 437; *Hopson's Appeal,* 65 Conn. 140.

If the Public Service Commission is a court, the Legislature could, under our Constitution, establish it as a court. *Sill* v. *Corning,* 15 N. Y. 297; *People* v. *L. I. R. R.,* 134 N. Y. 507; *Commonwealth* v. *Eastern R. R. Co.,* 103 Mass. 258; *Roxbury* v. *B. & P. R. Co.,* 6 Cush. 424; *State ex rel. Milwaukee Medical College* v. *Chittenden,* 127 Wis. 468; *Canada Northern Ry. Co.* v. *International Bridge Co.,* 7 Fed. 653; *Zanesville* v. *Telephone & Telegraph Co.,* 63 Ohio 442, S. C. 64 Ohio 67; *Queen City Tel. Co.* v. *Cincinnati,* 27 Ohio Cir. Ct. 385; *Central Ry. Company's Appeal,* 67 Conn. 197; *Norwalk Ry. Company's Appeal,* 69 Conn. 576; *Spencer's Appeal,* 78 Conn. 301.

The opportunity for judicial review of the commission's orders is sufficient, within the requirement of due process of law. Con. Lim. 350; *Bartlett* v. *Wilson,* 59 Vt. 24; *Dartmouth College* v. *Woodward,* 4 Wheat. 519; Works of Webster, Vol. 5; *State ex rel. Oregon etc. Co.* v. *Railroad Commission of Washington,* 100 Pac. 179; *Minneapolis etc. Co.* v. *Railroad Commission of Wiscon-*

*sin*, 116 N. W. 905; *State ex rel. Northern Pac. Ry. Co.* v. *Railroad Commission of Wisconsin*, (Wis.) 121 N. W. 919; *Niagara Fire Ins. Co.* v. *Cornell*, 110 Fed. 816; *N. Y. & N. E. R. R. Co.'s Appeal from Railroad Commissioners*, 62 Conn. 527; *McGraw* v. *Mo. Pac. Co.*, 132 S. W. 1076; *Wyman* v. *Essex County Comm'rs.*, 157 Mass. 55; *Lynch* v. *Forbes*, 161 Mass. 302; *In re Selectmen of Hadley*, 178 Mass. 319; *Bacon* v. *B. & M. R. R.* 83 Atl. 421; *Louisville etc. Co.* v. *Siler*, 186 Fed. 178.

HASELTON, J.   This is a petition of citizens of Alburgh addressed to the Board of Railroad Commissioners, now the Public Service Commission, asking for better protection at the railroad station in Alburgh, and requesting, among other things, that the commission order the defendant companies to install and operate gates at the highway crossing near the station.   After due notice a hearing on the petition was had at Alburgh, November 16, 1911, the defendant companies appearing by their respective attorneys.   Some time after the hearing the commissioners employed an expert who examined the condition complained of and made a detailed report to the commissioners.   June 1, 1912, an order was made by the commission directing the defendants to construct and operate gates at the crossing in question.   The Rutland Railroad Company brings the case to this Court by an appeal duly taken from the order of the commission.

The questions chiefly argued are constitutional ones; but we first discuss the other questions raised, for the constitutionality of an act will not ordinarily be considered unless such consideration is necessary to the disposition of the cause in hand.

It is claimed that the commission does not have, under the statute, authority to order gates and flagmen at highway crossings in towns as distinguished from cities and villages.   P. S. 4433, is referred to and the reading of that section indicates that the Legislature did not intend to confer upon the commission authority to order gates to be erected and operated at crossings outside of villages or cities merely because of the situation created by such crossing.   But the crossing in question is only some four or five rods from the station at Alburgh, which is a through station on the Central Vermont Railway, is also on the main line of the Rutland Railroad, and is the terminus of the Ogdensburgh Division of that Railroad.   The passenger platform extends

22

westerly from the grade crossing, and southerly of the platform are first the Central Vermont traffic track, then the main line of the Rutland Railroad, and then the line on which the trains of the Ogdensburgh Division arrive and depart. We omit mention of a house track, so-called, used by both roads, since the commission, while stating its existence, do not emphasize it as an element of danger. The traffic and the movement of locomotives and cars at the place of the crossing is very considerable and many persons daily pass over some or all of the tracks. East, or easterly, of the highway and crossing, that is, on the other side of the highway from the passenger station, are the freight yard, engine house, water crane, and coaling plant of the appellant. The round-house is east of the crossing. A large number of persons cross a track, or tracks, in going to and from the station. The situation is a very dangerous one. The facts that we have recited appear from the report of the commissioners.

The railroad companies have under our practice, which is conformable to the practice in chancery, a right on appeal to raise the question of a sufficiency of the evidence to support the findings, but they have not done so, and in arguing the question now under consideration they rely solely upon the claim that the statute does not undertake to give the commission authority to make the order which it in fact made. But a railroad company is under obligation to make the surroundings and approaches to its stations reasonably safe, and the statute undertakes to confer upon the Railroad Commission authority to enforce that obligation. P. S. 2611; *Bacon* v. *Boston & Maine*, 83 Vt. 421, 442, 443, 445. See also *Rutland etc. Co.* v. *Clarendon etc. Co.*, 86 Vt. 45, 54; *Clarendon* v. *Rutland R. Co.*, 75 Vt. 6; *Beard* v. *Connecticut & Passumpsic Rivers R. Co.*, 48 Vt. 101; *Sawyer* v. *Rutland & Burlington R. Co.*, 27 Vt. 370; *Hale* v. *Grand Trunk*, 60 Vt. 605; *Nelson* v. *Vermont & Canada R. Co.*, 26 Vt. 717; *Covington Stock Yards* v. *Keith*, 139 U. S. 128.

The appellant also contends that the order of the commissioners must be reversed on the ground that the hearing required by statute was not given to the railroad companies.

In matters like that in question the statute contemplates that the commission shall act upon due notice and hearing, and it here sufficiently appears from the report that after the hearing of November 16, 1911, the commission employed an expert who

made investigations and laid the result thereof before the commission, and that no opportunity was afforded the defendants to examine the expert or to present evidence in rebuttal or to argue the case as it finally stood. And it sufficiently appears that the report of the expert was considered by the commission and aided them in arriving at their conclusions. So we think that the order was not made in pursuance of statutory authority.

This brings us to the constitutional questions. The appellant claims that the statute creating the Board of Railroad Commissioners is void, and that the board is without legal existence or authority, and further that, in any view, the provisions of the statute under which the board acted in this case are unconstitutional and void. The decision of these constitutional questions is essential to the disposition of the case here; for if the Railroad Commission is a legally existing body and had authority to act in the premises, this case should be remanded for a new hearing before the commissioners, but if the Railroad Commission has no legal existence, or has no authority in the premises the case should be disposed of here for we have no right to send the case for hearing to any illegal body or to a body which has no authority to act.

The appellant claims that all laws creating or relating to the Public Service Commission or conferring any authority upon it; and particularly the provisions of P. S. 4611, are unconstitutional because they undertake to confer legislative, executive, and judicial functions upon the commission and that such functions are, by the laws referred to, hopelessly commingled, contrary to the provisions of the Constitution of this State.

In order to gather the legislative intent expressed in the Act of 1906, the constitutionality of which is questioned, it is permissible and desirable to trace briefly the history of previous legislation upon the same subject.

In 1854, a bill establishing the office of Railroad Commissioner was introduced into the Senate, and passed that body. However, the bill failed to pass the House. But at the session of the year named a joint resolution was adopted requesting the Governor to appoint three commissioners who should be required, among other things, to report, upon an investigation, what legislation was necessary for the protection of the rights of the State and of the public in respect to railroad corporations,

and for the protection of the shareholders, bondholders, and general creditors of such corporations. Journal of the House, 1854; Journal of the Senate, 1854; Acts of 1854, p. 72.

The Governor accordingly appointed three commissioners who reported at the legislative session of 1855. These commissioners were Jacob Collamer, Daniel Kellogg, and Hyland Hall, all of whom had been Judges of this Court and were profound constitutional jurists. At the time when the report was made Collamer had entered upon his distinguished service as Senator from this State. They recommended the passage of an act establishing a Board of Railroad Commissioners to be appointed by the Governor with power to examine into the physical and pecuniary condition of every railroad in the State, to require each railroad to report to them under oath, and to examine the books, papers, and documents of a railroad corporation, or its officers, to examine such officers, or the employees of a road, or other persons under oath, to issue subpoenas, and administer oaths in the same manner and with the same powers to enforce obedience thereto "as belong and pertain to Courts of Law in this State." They recommended that every person who should hinder or impede the commissioners in the execution of their duties should be subject to the punishment provided by law for hindering and impeding officers, judicial or executive, that any person who should fail to make the return required should be guilty of a misdemeanor and punishable by fine and imprisonment, that any person refusing access to the papers referred to, or refusing information required by the commissioners in the discharge of their duties should in like manner be deemed guilty of a misdemeanor and be liable to fine and imprisonment, and that any person who should be guilty of wilful falsehood, or suppression of truth, in making any return, or in furnishing information or making a statement under oath to the commissioners should be deemed guilty of perjury and punished accordingly.

The provisions referred to looked to the power of the commission to gather information and to report to the Legislature; and at the session of 1855, they were enacted into law without any material change, except that, instead of a Board of Commissioners one commissioner was provided for, and except that, instead of providing for his appointment by the Governor, the law provided for his annual appointment by the Judges of this Court.

The eminent jurists whom we have named further recommended that the Railroad Commissioners should from time to time make all such rules, orders and regulations, for the repairs, conduct and management of the respective railroads as they should judge necessary for the public safety, and that the commissioners should have power to enforce the same effectually, and that to that end they have authority to remove the rails of a railroad or otherwise to prevent the use of a road until compliance with such orders and regulations was secured. This recommendation was not adopted by the Legislature. But it shows the views of the constitutional lawyers who made it as to the scope of the powers which they thought might properly be conferred under our constitution upon an administrative body, for in making their recommendations they expressly refrained from touching upon matters which they thought were properly for determination by the Courts and declined "to recommend any doubtful regulations." Journal of the House, 1855, pp. 642-649; Acts of 1855, No. 26.

We take it for granted that in their broad recommendations, made after full time for deliberation, these men well understood that the courts are open to prevent an administrative body, exercising the police power, from exceeding its jurisdiction and from taking arbitrary and unreasonable action, and that no special provision of law is necessary to confer upon the courts authority already possessed by them under our State Constitution.

As every one knows, in the early days of railroading when these recommendations were made, the interruption of interstate commerce and interference with the transportation of the mails were not much if at all considered, otherwise some other method for the prompt and efficient enforcement of orders than that recommended would doubtless have been suggested.

In 1856, the appointment of the Railroad Commissioner was taken from the Judges, but in other respects the law remained practically unchanged until 1886, except that in 1876, the Railroad Commissioner was empowered to establish a uniform system of keeping railroad accounts, and the several railroad companies of the State, by whomsoever operated, were required to conform to such system so far as it was compatible with law. Acts of 1876, No. 26; See Revised Laws of 1880.

Meanwhile in the early part of the period named, that is, in 1857 and 1858, George P. Marsh was Railroad Commissioner

for this State. He was then a ripe lawyer in the maturity of his powers of discrimination and judgment, and about to enter upon that large career which made such powers manifest both in America and in Europe.

He declared that he had no doubt of the legal power of the Legislature to subject railroad corporations in all respects to such general regulations as the public interest might demand, and expressed the opinion that such legislation would violate no fundamental law. He pointed out that the authority of the commissioner to make investigations and reports was inadequate, that in view of the comparatively short time during which the Legislature is in session there should be a board to which regulative power should be delegated, and he expressed the belief that there was no sound constitutional objection to the recommendations in that regard made by Collamer, Kellogg, and Hall, in 1855, and he said further that there ought to be a Board of Commissioners with even larger powers than those which they recommended, that the power to make regulations affecting the public convenience as well as the public safety should be conferred upon a commission. Report of Railroad Commissioner, 1858; Report of Railroad Commissioner, 1859.

Nothing for a long time came of his suggestions. In 1886, the Railroad Commissioner was superseded by a Board of three Railroad Commissioners. (Acts of 1886, No. 23). The board was authorized to appoint a clerk, whose duties should be to keep records, file and preserve documents and papers, prepare for service such papers and notices as might be required by the commissioners, to issue subpoenas for witnesses and to administer oaths. Speaking generally the board was given the administrative powers which are conferred upon it by the act now in question. Many of the sections in the two acts are identical.

Under the Act of 1886, if, in the performance of their duties, the commissioners issued subpoenas which were disobeyed or sought proper information which was refused, they could apply to a Judge of the Supreme Court, who could summon before him the person so disobeying or refusing and determine whether or not the requirements of the commissioners were proper and necessary to the performance of their duties. If the Judge found affirmatively he was to enforce the attendance and examination of the person in question, and the exhibition of the books,

accounts and papers required. How the Judge was to do this was not provided for in the statute. The commission was not to give publicity to the information acquired by them under the provisions of the act except so far as was necessary in reports to the Legislature or "in judicial proceedings" unless specially required so to do by the law. This provision that the board should not give publicity to information acquired by it, unless required by law, except in reports to the General Assembly or in "judicial proceedings" is a part of the act particularly under consideration.

It was further provided by the Act of 1886 that any person who should wilfully hinder the commissioners in the discharge of any of their duties might be summoned before any Supreme or County Court, six days' notice being given, and that, after hearing the parties the Court might make such orders, "as should be necessary to carry out the provisions of the act." False returns to the commissioners made under oath as required by law, and false testimony before them were to be deemed perjury.

Violation on the part of any railroad corporation of any constitutional provision or of any provision of general law or of its charter, any failure properly to provide for the security of the public, any unjust discrimination in charges, any conspiracy whereby rates were unduly increased, any wilful refusal of compliance with any reasonable recommendation of the commissioners was to be called to the attention of the offending corporation by a notice in writing, and if the thing complained of was continued after such notice the board were to report the same to the next session of the General Assembly, and, if the judgment of the commissioners so required, they might at any time make an application to the Supreme Court, or county court, for "any remedy warranted by law."

With regard to many matters, "in order to promote the security, convenience and accommodation of the public, or to prevent violations of law, or unjust discriminations, usurpations or extortions" the board, after giving notice of its recommendations, might fix a time within which its recommendations should be complied with, and it was provided that the Supreme Court "sitting as a court of equity" might compel compliance with such recommendations, if in the judgment of the Supreme Court,

upon hearing and legal proof the recommendations were just and reasonable.

The law was not greatly changed from 1886 to 1906, when the law under consideration was enacted. In the interval, however, it was provided that the board should have a seal on which should be the words "State of Vermont, Board of Railroad Commissioners, Official Seal," and that this seal should be used in the attestation of all copies of the files and records of the board. The jurisdiction, too, of the commissioners was made to cover electric railroads.

An Act passed in 1902, reenacted a number of sections with changes so slight as to be immaterial to this discussion. The only important changes we note. There was a clause designating as "orders" to a person, or corporation, what the Act of 1886, had called "recommendations," and providing a penalty for each day's neglect thereof. It was provided that a person, or corporation, receiving the notice referred to had thirty days thereafter in which to appeal to the Supreme Court, and the appeal was to be heard at the stated term next after twenty-one days from the filing of the appeal. In 1902, we had only three stated terms of the Supreme Court, one in January, one in May, and one in October.

If the appeal involved any question of fact any persons interested might apply to any two Judges to have the facts found, and such two Judges were thereupon to make an order providing for the determination of the facts. The matter might be referred and heard on a finding of facts, or testimony might be reported to the Court.

If an appeal was taken the order was thereby stayed, and no fine could be imposed for the time during which the appeal was pending. The fine was collectible by the state's attorney on complaint of the commissioners by means of "an action on the statute."

It was further enacted that if a railroad commissioner should neglect or refuse for a period of sixty days to perform any of the duties imposed upon him he should be removed from his office. But no duties worth mentioning were imposed upon an individual railroad commissioner, the duties of consequence were imposed upon the board, and this provision while high-sounding

seems somewhat frivolous.   See *State* v. *Plumley & Redfield,* 83 Vt. 491.

Moreover the Railroad Commissioners were appointed by the Governor by and with the advice and consent of the Senate for a fixed term and this provision for the removal of a commissioner after sixty days of neglect and refusal to act, without any suggestion as to the method of removal, seems to have been merely a rather early and inefficient suggestion of the recall.

The provisions of the Act of 1902, were by way of amendment of and addition to different sections of the Vermont Statutes, Revision of 1894, and need to be read as a part of Chapter 172, of the Vermont Statutes, which was superseded by the Act of 1906, No. 126 of that year, the act now under consideration.

The review of legislation which we have made shows the fairness and justice of the statements made by the Chief Judge of this Court in *Central etc. Ry. Co.* v. *State,* 82 Vt. 145, 150, to the effect that down to 1906 in this State very little had been accomplished in the way of the "regulation and control of railroads." Referring to the nature of the proceedings on appeal the Court justly said that the orders had been enforced mostly "if at all" through such proceedings. The opinion in that case does not treat the Act of 1906, as constituting a new body but as conferring additional authority upon the commissioners with a view to remedy a shortage of authority, and to enable the commissioners "to deal with the matters within their jurisdiction more effectually and speedily than they had ever been able to do before." In considering the act in question and the preexisting acts the opinion properly refers to what had been accomplished in other states.

The Law of 1906, the constitutionality of which is in question, retains the administrative features of the law of 1886. Many sections of both laws are identical. New provisions were made in 1906, but the law then enacted taken as a whole looked simply to a more efficient supervision and regulation of railroads in accordance with the long settled, though largely insufficient policy of the State.

We consider that under the Law of 1906, the Railroad Commission, now legally known as the Public Service Commission, by virtue of the Act of 1908, is an administrative body clothed

in some respects with functions of a judicial nature, quasi-judicial functions they may be called, authorized in the exercise of the police power to make rules and regulations required by the public safety and convenience, and to determine facts upon which existing laws shall operate. In a sense it has auxiliary, or subordinate, legislative powers; for while the supreme legislative power cannot be delegated there are many powers so far legislative that they may properly be exercised by the Legislature, which may, nevertheless, be delegated. The law in its general features is not open to the objection that it conflicts with the provision of our Constitution as to the distribution of the powers of government. The functions of an administrative officer, or body, may be to a large extent judicial and regulative in character. *State* v. *Howard,* 83 Vt. 6; *State* v. *Harrington,* 68 Vt. 622, 636; *Morgan* v. *Devarennes,* 86 Vt. 137; *Lock's Appeal,* 72 Pa. St. 491, 13 Am. Rep. 715, 723; *State* v. *Corvullis,* 117 Pac. 980 Mich.; *Michigan Central R. Co.* v. *Michigan R. Comms.,* 160 Mich. 355, 361, 125 N. W. 549; *R. R. Comm. Cases,* 116 U. S. 336; *Minn. St. Paul etc. Ry. Co.* v. *R. Comms.,* 136 Wis. 142, 162, 116 N. W. 905, 911, 17 L. R. A. (N. S.) 821.

The provision for keeping the departments of government separate does not mean an absolute separation of functions, for if it did it would really mean that we are to have no government, whereas our Constitution was ordained for the establishment of efficient government. The proposition is obvious but we cite some cases. *In Re Trustees etc.* v. *Saratoga etc. Co.,* 191 U. S. 123; *Atlantic Coast Line* v. *N. C. Corporation Comm.,* 206 U. S. 1; *State* v. *Bates,* 96 Minn. 110, 115, 119; *State* v. *Railroad Comm.,* 100 Pac. 179; *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Wayman* v. *Southard,* 10 Wheat. 1; *N. Y. Life Ins. Co.* v. *Hardison,* 199 Mass. 190; *State* v. *Railroad Comm.,* 121 N. W. 919; *B. Chicago etc. Railroad Comm.* v. *Day,* 35 Fed. 866; *South etc. Ry. Co.* v. *Railroad Comm.* 87 N. E. 966.

We do not take the view urged by the appellant that the Constitution prohibits the Legislature from creating courts not named in the Constitution, but if the Legislature had created the Railroad Commission a court in the strict sense, it could have conferred upon it no powers which might not have been conferred upon the courts already existing if they did not already possess them and nothing really would have been accomplished except to create new offices and provide for more officials.

That it was the cardinal purpose of the Legislature to render efficient the policy already pursued, a policy in general harmony with that which prevails in most of the states, by the establishment of an effective administrative body for the supervision and regulation of railroads, seems sufficiently clear.

The cardinal purpose of the act is to control in the construction of minor provisions and the settled policy of the State in legislating upon the subject-matter is to be regarded in construing the act. *Ryegate* v. *Wardsboro,* 30 Vt. 746; *Montpelier Savings Bank* v. *Montpelier,* 73 Vt. 364.

And the act is to be given such a construction as makes it constitutional where such construction is reasonably possible. *In re Allen,* 82 Vt. 365.

Moreover, there is a presumption of a constitutional purpose on the part of the Legislature, a presumption as strong, perhaps, as any that is not conclusive, and if the main purpose of the act cannot be declared unconstitutional, as it cannot, then unconstitutional provisions, if there are such, simply become inoperative without affecting the validity of the act as a whole; since they are such that they are severable. *State* v. *Paige,* 78 Vt. 286; *State* v. *Haselton,* 78 Vt. 467; *State* v. *Peet,* 80 Vt. 449; *State* v. *Kibling,* 63 Vt. 467; *State* v. *Scampini,* 77 Vt. 92; *Reagen* v. *Farmer's Loan & Trust Co.,* 154 U. S. 362, 365; *Wisconsin etc. R. Co.* v. *Jacobson,* 179 U. S. 287, 301.

In the case of the *Central Vermont Railroad Co.* v. *The Public Service Commission,* 189 Fed. 683, it was held by the Circuit Court of the United States for the District of Vermont, after a discussion of our statute and the decisions construing and applying it, that our commission is not "a court," and that this Court had carefully preserved all of the rights of parties, in such a proceeding, as this, had protected them to the fullest extent, and quotations from our opinions were made showing the reasonable view which this Court had taken in putting its construction upon the powers of the commission in respect to supervision and regulation.

The Public Service Commission is not in the strict sense a court, though like many administrative bodies it may exercise quasi-judicial functions but it is a governmental agency provided for the administration, in respect to certain specific matters,

of what in a broad, though true, sense may be called the police power.

In *Bacon* v. *Boston & Maine R.*, 83 Vt. 421, at page 451, it was said of the police power that it might be deemed sovereignty itself rather than a mere attribute of sovereignty; and very recently the Supreme Court of the United States has declared the same thing by saying "in a sense, the police power is but another name for the power of government," *Mutual Loan Co.* v. *Martelle,* 222 U. S. 225, and long ago that same tribunal declared that "the police powers of a state are nothing more nor less than the powers of government inherent in every sovereignty to the extent of its dominions." *License Cases,* 5 How. 504, 583.

Power to provide for the public safety and convenience stands upon the same ground as the power to protect the public health and the public morals. *House* v. *Moyer,* 219 U. S. 270, 282; *Lake Shore etc. Ry. Co.* v. *Ohio,* 173 U. S. 285, 300; *Thorpe* v. *The Rutland R. Co.,* 27 Vt. 140, 149; *Bacon* v. *Boston & Maine,* 83 Vt. 421, 449, 451; *Carty* v. *Winooski,* 78 Vt. 104, 108; *State Board of Health* v. *St. Johnsbury,* 82 Vt. 276, 285.

The people of this State may provide for the exercise of visitatorial and police powers to secure compliance with laws enacted under the general reserved powers of government never surrendered to the Federal Government, and this they may do in accordance with Article 5, of Chap. 1, of our Constitution, which provides "that the people of this State by their legal representatives, have the sole inherent and exclusive right of governing and regulating the internal police of the same." Railroad corporations and all corporations and persons are subject to this power.

It is indeed beyond the power of a state to divest itself of its right and duty in respect of the full exercise of this power, and the Federal Government cannot interfere with a state in the exercise of that right and duty except by virtue of some authority derived from the Constitution of the United States. *Northern Pac. Ry. Co.* v. *Minnesota,* 208 U. S. 593, 596, 597, 598; *House* v. *Mayes,* 219 U. S. 270, 282; *Chicago etc. Ry. Co.* v. *Arkansas,* 219 U. S. 453, 465; *Cincinnati etc. Ry. Co.* v. *Conersville,* 218 U. S. 336, 344; *Barbier* v. *Connolly,* 113 U. S. 27; *New York & New England R. Co.* v. *Bristol,* 151 U. S. 556, 567, 571; *Chicago etc. R. Co.* v. *Chicago,* 166 U. S. 226, 252-255; *Detroit R. Co.* v. *Os-*

*borne,* 189 U. S. 383; *Orleans Gas Light Co.* v. *Drainage Comm.,* 197 U. S. 453; *Chicago etc. Ry. Co.* v. *Illinois,* 200 U. S. 561, 592.

The efficient exercise of the police power inherent in the people of this State is not to be frittered away by over-nice speculations upon the distribution of the powers of government. Our Constitution makes a general distribution of powers, but does not descend to those details which are found in some constitutions and which have resulted in discussions calculated to debilitate government itself.

The Interstate Commerce Commission is an administrative body and is referred to by the appellant as a constitutional pattern for such bodies, and the appellant does not question that the judicial review of its orders by the courts is such as consists with the division of the powers of government into three great departments. But in the last volume of United States Reports, the Supreme Court of the United States, in an unanimous opinion delivered by Chief Justice White in overruling a decision of the Commerce Court say of the Interstate Commission and the review of its orders: "Originally the duty of the courts to determine whether an order of the commission should or should not be enforced carried with it the obligation to consider both the facts and the law. But it had come to pass prior to the passage of the act creating the Commerce Court that in considering the subject of orders of the commission for the purpose of enforcing or restraining their enforcement the courts were confined by statutory operation to determining whether there had been violations of the constitution, a want of conformity to statutory authority, or of ascertaining whether power had been so arbitrarily exercised as virtually to transcend the authority conferred although it may be not technically doing so." *Proctor & Gamble Co.* v. *United States,* 225 U. S. 282, 298; See *Int. Comm. Comm.* v. *Union Pac. R. R. Co.,* 222 U. S. 541; *Int. Comm. Comm.* v. *Delaware etc. Co.,* 220 U. S. 235, 251; *Int. Comm. Comm.* v. *Illinois Central R. Co.,* 215 U. S. 452; *Baltimore etc. R. Co.* v. *Pitcairn Coal Co.,* 215 U. S. 481.

We have spoken of the commission as being clothed with auxiliary or subordinate legislative functions. The General Assembly cannot delegate functions which are purely and strictly legislative, but having by general law and by charters made legislative provisions of unquestionable constitutionality ap-

plicable to railroad corporations it may confer upon the commission the power upon investigation to apply the general provisions of law to particular circumstances and situations and may leave much of detail to the discretion of the commission. *Butterfield* v. *Stranahan,* 192 U. S. 470; *Union Bridge Co.* v. *United States,* 204 U. S. 384; *United States* v. *Grimaud,* 220 U. S. 506, 516.

But where a board, as the Board of Health, or the Board of Railroad Commissioners, has conferred upon it the power to make rules and regulations in furtherance of the police power, the statute is interpreted as though it conferred only the power to make reasonable regulations, and so the legislative act becomes complete, and the question of whether the rules and regulations presented are reasonable, or are unreasonable and arbitrary, is a strictly judicial one of which the courts must take cognizance whether the statute provides for proceedings in that regard or not. *State* v. *Speyer,* 67 Vt. 502; *In Re Trustees* v. *Saratoga etc. Co.,* 191 N. Y. 23; *State* v. *Haskell,* 84 Vt. 423, 431; *Brownell* v. *Russell,* 76 Vt. 326; *State* v. *Audette,* 81 Vt. 400; *Bacon* v. *Boston & Maine,* 83 Vt. 421; *State* v. *Central Vermont Ry. Co.,* 81 Vt. 459; *Boote etc. Co.* v. *Baker,* 196 U. S. 119, 126; *Cosmas Co.* v. *Grey Eagle Co.,* 190 U. S. 309; *Grand Trunk Ry. Co.* v. *Railroad Comm. of Md.,* 221 U. S. 400, 403.

The Legislature might properly authorize a commission to make an investigation such as was here made and on the facts found to make an order such as is appealed from; and since this is so, and since the statute in its general features is constitutional as against the objection which we are now considering there is no propriety in our considering provisions not directly drawn in question.

If there are powers conferred upon the board which cannot be conferred upon an administrative body because of the constitutional provision that the departments of government be kept separate they do not render the statute as a whole unconstitutional for in the light of the history of legislation upon this subject-matter and from a reading of the statute itself it is to be presumed that the Legislature would have passed the constitutional part of the statute without the unconstitutional part. *State* v. *Scampini,* 77 Vt. 92, 59 Atl. 201; *State* v. *Abraham,* 78 Vt. 53, 61 Atl. 766; *Howard* v. *Illinois Central R. Co.,* 207 U. S.

463, 52 L. ed. 297; *Field* v. *Clark,* 143 U. S. 649; *Huntington* v. *Worthen,* 120 U. S. 97, 102.

In arguing that the Legislature has undertaken to confer upon the board full judicial powers such as cannot be conferred upon an administrative body the appellant in its brief calls attention to the fact that the statute confers upon the board power to compel, by proceedings for contempt, the attendance of witnesses and the production of evidence.   The brief does not discuss the power of a Legislature directly to exercise the power of punishing for contempt or to confer it upon either of its branches, or upon committees, or established boards, constituted for the purpose of gathering information for the Legislature or of ascertaining and declaring facts, which call into operation the legislative will.       .

We do not need to consider the matter here, for, assuming, but not deciding, nor intimating, that this power could not be conferred upon the railroad commissioners, we meet a situation in which the commission is not inefficient, for the Legislature further provided that witnesses duly subpoenaed who refuse, or neglect, to appear before the board, or who refuse to testify before it, shall be subject to the penalties of the statute applicable to witnesses who.neglect, or refuse, to obey subpoenas to appear and testify before the courts, and a penalty is provided for any person who wilfully obstructs the commissioners in the discharge of their duties by refusing to furnish information.   The penalties referred to, it must be understood, are enforceable in courts of law in the same manner as are other penalties prescribed by statute; and in providing for penalties as well as for summary punishment by contempt the Legislature was doing nothing in its nature inconsistent, *In Re Chapman,* 166 U. S. 661, nothing from which the inference can be drawn that if it could not lawfully do both it would have done neither.   As has been said of some statute of this sort, ''The object of the statute was not the imposition of penalties.''

If the one provision fails the other is not as a consequence rendered invalid and the right of the commissioners to conduct investigations with such powers and sanction as are left is unaffected.

In arguing this matter mention is further made of the fact that the board may by ''suitable process'' issuable by a court

of law or equity enforce its own decrees. This, indeed, the statute gives it authority to do except as its orders are stayed by judicial action on the part of the courts. It is not necessary to inquire, and we give no consideration to the question of, whether there is any just analogy between the collection of taxes without the intervention of the courts and the enforcement of police regulations by means of process issuing directly from an administrative or ministerial body, if the courts are not called on to interfere. If the statutory provision in question, when properly construed, is unconstitutional, and we do not decide the point or intimate an opinion upon it, it cannot be presumed that without this provision the Legislature would not have passed the act for it further provides a penalty for any person who shall fail within a reasonable time to obey a final order, or decree, of the board. These penalties are to be enforced through the courts, for they are put on the same footing with the crime of perjury in giving false testimony before the board. No claim is made that the provisions as to penalties are unconstitutional.

Some provisions of the law not herein referred to are claimed to be unconstitutional, and the reason they are not here referred to is that, if after full discussion by parties directly interested in them in a particular case, it should turn out that they are unconstitutional, they are so clearly severable that the constitutionality of the law as a whole would not be affected.

The appellant further claims that the Public Service Commission Laws are void on the ground that, for want of a provision for an adequate judicial review of the orders of the commission, they are in violation of the provisions of our State Constitution and of the Federal Constitution prohibiting the taking of property without due process of law.

Under the statute providing for appeals the party upon whom an order is made may, if it pursues the orderly and not burdensome course pointed out by the statute, present to this Court the questions of the propriety of the rulings of the commission in receiving or excluding evidence, the sufficiency of the evidence to sustain the findings under the rule which obtains in this State that a mere scintilla of evidence will not sustain a finding, and the question of the sufficiency of the findings to warrant the order under the rule that the order must not be unreasonable or arbitrary in its character and that it must bear

some just relation to some reasonable purpose with a view to which authority to make it was conferred.

Moreover, the rights of a party are not necessarily limited to those which he may secure by an appeal.   Section 4, Chapter 2 of our Constitution, providing that: "The courts shall be open for the trial of all causes proper for their cognizance," means, among other things, that by a proper proceeding the question of whether an administrative body has exceeded its powers, may be brought before and determined by the established courts.   No special machinery need be provided for this purpose for the common law which is a part of the law of this State provides the requisite machinery.   As the courts have authority to determine the constitutionality of legislative acts, so in all cases they have, and must have, authority to determine whether or not any board or commission claiming to act under legislative authority has exceeded its powers.   The powers given to this Court on appeal, and the common law remedies for the protection of rights which cannot be safe-guarded by means of the hearing and appeal provided for by statute, are sufficient to secure to every party interested in the orders of the Railroad Commission a vindication of his full rights against arbitrary and unreasonable action, usurpation of powers, and acts in excess of authority. These principles are firmly established in this jurisdiction. *State* v. *Speyer*, 67 Vt. 502; *State* v. *Morse*, 84 Vt. 387; *State* v. *Haskill*, 84 Vt. 429; *State Board of Health* v. *St. Johnsbury*, 82 Vt. 276.

The appellant invokes the case of *Oregon etc. Co.* v. *Fairchild & State Railroad Commissioners*, 224 U. S. 510, but we understand that the doctrine of that case is in accord with that herein announced and fully set forth in the cases decided by this Court, that are above referred to, as well as in other decisions of this Court.   In that case the judgment of the State Court was reversed because the fundamental principles here recognized were not there fully regarded.

We do not, of course, assert the right of the State to regulate interstate commerce for that right all the states surrendered to the general government.   But in this case it is not claimed that the order of the commissioners conflicts with the Constitution of the United States on the ground that it interferes with interstate commerce.

24

As this question is not raised we do not discuss it.   Nor do we discuss the question of whether any subject over which the commission has been given jurisdiction has been so covered by Federal legislation that the State enactment in that respect is superseded.   If that should be found to be the case in respect to any matter over which Congress has a right to assert, and has asserted, its paramount authority the force of the State law as a whole would not be in other respects impaired.

*Our conclusion is that the Public Service Commission is a legally constituted body with authority to act and make orders with reference to the dangerous situation which, as the case now stands, appears to exist in the vicinity of the Alburgh station, and the cause is remanded to the Public Service Commission for further proceedings upon due notice and hearing.*

POWERS, J., dissenting.   The Public Service Commission made an order requiring the defendants to install, maintain and operate suitable gates at a grade crossing at the railroad station Alburgh.   The Rutland Railroad Company appealed from that order, and seeks an annulment thereof on the grounds (1) that the findings of the commission are predicated, in whole or in part, upon evidence received after the hearing provided for by law had finally adjourned; and (2) that the act creating the commission is unconstitutional and void.

1.   The record before us shows that these proceedings were begun by a petition filed with the commission on September 23, 1911; that a subpoena was duly issued by the clerk of the commission, therein specifying a time and place for a hearing on the petition; that service of this subpoena was duly accepted by the defendants, and that a hearing was had on November 24, 1911,—both defendants being represented by counsel.   The commission reports that the question what ought to be done in the matter had caused it a good deal of embarrassment, and had resulted in the employment by the board of an expert who had carefully examined the condition complained of in respect of the crossing and made the commission a detailed report.   The commission further reports that on April 8, 1912, an actual count, made under the supervision of its expert, showed that 688 persons traversed the crossing between 5:00 a. m. and 9:00

p. m., and that during that time there were 49 train movements
over it, and that these figures showed about the daily traffic at
that point.    The commission makes some further analysis of
these figures and says that "enough has been said to show that
this crossing is a very dangerous one."    An electric alarm bell is
now installed there and operated by the Central Vermont Rail-
way Company, but owing to certain conditions pointed out by
the commission it does more harm than good.    The commission
goes on to say that its expert reports, that all the evidence
showed (and the commission so finds) that it is impracticable
to install an electric bell system of alarm so connected with the
tracks of both defendants as to afford any protection to this
crossing.    The commission considered the elimination of the
crossing; but the large expense involved and the limited appro-
priation available precluded this.    "We therefore find," con-
cludes the commission, "that public safety requires that this
crossing be protected by the installation and maintenance of
gates and fences for that purpose," as indicated in the order
appealed from.

It is quite apparent from the report of the commission that
its findings are based, partly if not wholly, upon the report of
its expert.    He was not appointed until after the hearing on
November 16, and it is evident that the dangers of the crossing
are in a great measure due to the large amount of daily traffic,
by persons and trains, over it.    This was wholly ascertained, so
far as the facts are shown, by the count supervised by the expert,
—without which it would not appear that enough had "been
said to show that this crossing is a very dangerous one."

Besides, it was the evidence before the expert and not that
before the board that resulted in a finding rejecting the idea
of a more efficient electric signal.

So we cannot escape the conclusion that in reaching its
ultimate finding the commission made use of evidence taken
outside the public hearing, which the defendants had no oppor-
tunity to meet either by way of cross-examination, or otherwise.
This is not in accordance with the provisions of the law, and the
order predicated thereon is irregular and will be set aside.

This conclusion would dispose of the case, and would ordi-
narily preclude an examination of the constitutional question
raised.    For the general rule is that the court will not pass upon

the constitutionality of a statute unless it is necessary to do so in order to finally dispose of the case. *Blanchard* v. *Barre,* 77 Vt. 420; *State* v. *Wilson,* 79 Vt. 379; *Post* v. *Rutland R. Co.,* 80 Vt. 551; *State* v. *B. & M. Railroad,* 82 Vt. 121. But this rule has its exceptions; when the settlement of such question is one of public importance, the court may properly consider and dispose of it, although such a course is not necessary to a disposition of the case. *Borgris* v. *Falk Co.,* 147 Wis. 327. This is well shown by the statement in *Light* v. *United States,* 220 U. S. 523, 55 L. ed. 570: "Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued, and is not departed from without important reasons."

The settlement of the constitutional question involved in the case in hand is of great public importance and it is of the highest consequence that it be passed upon while the Legislature is in session, that such amendments in the law as may be found necessary, if any, may be promptly made, without awaiting another session of that body. So it is deemed best to treat the case as exceptional and to dispose of the constitutional question presented.

The claim of the defendant is, that by the act creating the commission and defining its powers and duties (No. 126, Acts of 1906.) legislative, executive and judicial powers are so blended and conferred upon it as to transgress the provisions made for the separation of those powers by Chapter II of the Constitution of this State.

A consideration of this claim is unembarrassed by two features which may as well be set aside at the outset: We need not consider what powers and duties may, without constitutional objections, be conferred upon the members of the commission as individuals, for the legislation referred to relates solely to the board, as such. Nor are we called upon to examine the constitution of the United States upon the question directly raised, for it contains nothing to prohibit a state, under its own laws, from conferring different governmental powers upon the same body or agency. *Livingston's Lessee* v. *Moore,* 7 Pet. 469, 8 L. ed. 751; *Reetz* v. *Michigan,* 188 U. S. 505, 47 L. ed. 563; *Consolidated Rendering Co.* v. *Vermont,* 207 U. S. 541, 52 L. ed. 327; *Prentis* v. *Atlantic Coast Line R. Co.,* 211 U. S. 210, 53 L. ed.

150.   Though, as we shall see, the decisions of the Federal
Supreme Court are most valuable guides to a proper decision of
the question.

It is one of the fundamentals of the American system
of constitutional government that all governmental power
shall be separated into three classes and conferred upon three
distinct, but coordinate departments,—legislative, executive, and
judicial.   Such a distribution has always been considered by the
American people as necessary to the security of the liberties of
the citizen, the certainty of popular government, and the per-
petuity of free institutions.   The founders of our State believed
with Blackstone that "in all tyrannical governments, the right
both of making and enforcing the laws, is vested in one and the
same man, or one and the same body of men, and that wherever
these two powers are united together, there can be no public
liberty."   It was said by Judge Aikens in *Bates* v. *Kimball,* 2
D. Chip. 77, that "the necessity of a distinct and separate exist-
ence of the three great departments of government was well
understood by the people of this State at the time of the adoption
of our Constitution.   Its importance to the security of public
liberty and private rights had been proclaimed and enforced by
some of the wisest and most eminent men of other countries and
of this, among whom are Montesquieu, Sir William Blackstone,
Jefferson and Madison."   Accordingly, our first constitution,
adopted in 1777, and borrowed from that of Pennsylvania
adopted the year before, provided for this distribution of govern-
mental powers, but contained no prohibiting clause.   And it
must be admitted that during the first septenary of our state
government, this constitutional provision was too often disre-
garded.   To a student of the history of the times, however, it is
not altogether surprising to find the Legislature, with some
frequence, encroaching upon the domains of the other depart-
ments, especially that of the judiciary.   It passed acts prohibit-
ing the trial of cases involving title to land; prohibited trials
predicated upon certain contracts; set itself up as a court of
chancery; appointed a commission to decide disputes over titles
and made its own decree conclusive; it granted new trials.   Nor,
during the same time, was the council free from similar trans-
gressions.   It remitted a part of a debt contracted in Continental
money; authorized the surveyor-general to settle the accounts of

those running lines under his direction; passed a resolution requiring certain papers belonging by law to the office of the secretary of state to be deposited with its clerk; substituted a charter of another gore of land for one granted by the Assembly; it granted divorces. All this is not to be taken as an indication that the people lacked in appreciation of the importance of the provisions of the constitution referred to, or that they were indifferent to the limitations imposed by that document, but rather as a result of inexperience in governmental affairs, of impressions and prejudices acquired before they removed to this State, and the pressing necessities of the times. The first Council of Censors promptly and vigorously condemned these practices, revised the Constitution and called a convention to consider and act upon certain proposals of amendment. The result was, that while many of these were rejected, the one containing the prohibiting clause found in section 6 of Chapter II of our present Constitution was adopted: "The Legislative, Executive and Judiciary departments shall be separate and distinct, so that neither exercise the powers properly belonging to the other,"—since which time transgressions of the kind mentioned have been infrequent.

Our attention is called to the difference in phraseology in different prohibiting clauses,—how some are in terms more restrictive than ours. But I do not consider this of consequence. While these clauses differ somewhat in the terms used, the fundamental purpose and the ultimate object is the same in all, and the result is unaffected by the form of expression. The Constitution of the United States contains no prohibiting clause at all, yet it is held that the powers confided to one of the departments cannot be exercised by any other. *Kilburn* v. *Thompson,* 103 U. S. 168, 26 L. ed. 377. In the Alabama Constitution it was provided that "no person or collection of persons, being of one of these departments, shall exercise any power properly belonging to either of the others," while the Virginia Constitution contained a prohibiting clause just like ours. Yet the Supreme Court of the United States, in *Watkins* v. *Holman's Lessee,* 16 Pet. 25, 10 L. ed. 873, construed them to mean the same thing, saying: "The inhibition of the Alabama Constitution contains in terms, that which arises from the construction of the constitutions of other states." And it was said by Judge Cooley in

*Butler* v. *Saginaw County,* 26 Mich. 27: "It is well settled that the apportionment of legislative power to one department of the government will not authorize it to exercise any portion of the judicial power which is apportioned to another department. The apportionment is of itself an implied prohibition upon its exercise by the Legislature."

But that a complete and absolute separation of these governmental powers was not contemplated when our Constitution was adopted appears from the instrument itself. The governor is therein endowed with the veto power, and has, to a limited extent, a part in legislation. The house of representatives may order, and the senate try impeachments, therein acting as a judicial body. Each house of the general assembly may judge of the qualifications of its own members. Moreover, it has been found impossible in practice to keep the departments entirely separate, so that under no circumstances should one perform duties which partake of the character of those appertaining to another. No such exact division of governmental powers is possible. *State* v. *R. R. Com.,* 52 Wash. 17, 100 Pac. 179; *State* v. *Bates,* 96 Minn. 110; *So. Ry. Co.* v. *Melton,* (Ga.) 65 So. 665. "The division of governmental powers into executive, legislative, and judicial," said the court in *Minneapolis etc. R. Co.* v. *Railroad-Com.,* 136 Wis. 146, 17 L. R. A. (N. S.) 821, "while of great importance in the creation or organization of a state, and from the viewpoint of institutional law and otherwise, is not an exact classification. No such exact delimitation of governmental powers is possible."

It may safely be said that it has come to be everywhere recognized that constitutions do not forbid the exercise by one department of the government of functions partaking of the character of those belonging to another, when that shall be incidentally necessary to the proper discharge of its own duties. Although the powers of one department, in a full and complete sense of the term, cannot be delegated to another department, one department may perform acts which partake of the character of those of another, when they are coupled with the exercise of its own paramount power, and are essential to its complete and efficient use. *Watkins* v. *Holman's Lessee,* 16 Pet. 25, 10 L. ed. 873. Thus, the Legislature cannot delegate to this Court power to make a law; yet it may leave to this Court authority

to prescribe rules of practice which have the force and effect of a law. Therein the court exercises functions which partake of the legislative character, but only as an incident to the discharge of its proper judicial functions, and because essential to an efficient exercise thereof. So a commission of the character here in question in the prosecution of its duties and as a preliminary to final action, hears and decides after the manner of judicial bodies. The Legislature itself does this in some measure. But these are not transgressions of the limitations of the constitution, because they come within the rule just stated.

Turning now to an analysis of the powers and duties of the commission as established by the act of its creation, we find that by section 23 the supervision and regulation of railroads is entrusted to the commission. Power to that end is conferred with a lavish hand. It would be impossible to find terms with which to make a jurisdiction more inclusive. This power of governmental regulation is one of the attributes of that all-pervading police power, by force of which the state conserves the health, safety, convenience and welfare of its people. This power is committed to the Legislature, and, subject to certain limitations not here involved, may be exercised directly by legislative enactment or it may be vested in boards created for administrative purposes, to be applied according to a general legislative scheme. The power to supervise and regulate public services does not differ in kind or quality from that which is exercised in safeguarding the public health. *L. S. & M. S. R. Co.* v. *Ohio*, 173 U. S. 285, 43 L. ed. 702. It is delegable under the same circumstances and to the same extent. The maxim of the law that legislative power cannot be delegated applies in the one case in the same way and with the same result as in the other. Much time and learning have been expended by the courts in distinguishing between functions which are essentially and wholly legislative and so non-delegable, and those which involve the adoption of mere administrative regulations and so are delegable. It would not be profitable to review all that has been said on this subject or at this late day to inquire whether the courts have pushed the law too far in their anxiety to sustain the acts creating these most useful commissions. It is enough for me to say that it is now the settled law of the American courts that the power now spoken of—the power of

governmental regulation—may be turned over to an administrative body without violating the provisions of the constitution. The theory of the cases being that the Legislature lays down the general plan, and only leaves to the commission the power to fill in the details. *Wayman* v. *Southard,* 10 Wheat. 1, 6 L. ed. 253; *Union Bridge Co.* v. *United States,* 204 U. S. 364, 51 L. ed. 523; *United States* v. *Girmand,* 220 U. S. 506, 55 L. ed. 563. "The elementary proposition," says Mr. Justice White in *Atlantic Coast Line R. Co.* v. *Corp. Com.,* 206 U. S. 1, 51 L. ed. 933, "that railroads, from the public nature of the business by them carried on and the interest which the public have in their operation, are subject, as to their state business, to state regulation, which may be exerted either directly by the legislative authority, or by administrative bodies endowed with power to that end, is not and could not be successfully questioned, in view of the long line of authorities sustaining that doctrine." A more recent, and equally satisfactory statement is found in *Southern Ind. Ry. Co.* v. *Railroad Com.,* (Ind.) 87 N. E. 966: "The adjudications seem to be agreed that, as the state Legislature possesses the power to regulate the business of railroads, they may delegate that power to a commission or other administrative body, and what such administrative agent does, within the powers with which it is endowed, is as valid and conclusive as if done by the Legislature itself."

And this is saying no more than this Court has said; for in *Board of Health* v. *St. Johnsbury,* 82 Vt. 276, in speaking of the police power, we said: "That right, to say the least, embraces such reasonable rules and regulations, established directly by legislative enactment, as will protect the public health and the public safety. And the state may invest local or state boards, created for administrative purposes, with authority in some proper way to safeguard the public health and the public safety." And, again, in *State* v. *Morse,* 84 Vt. 387, in speaking on the same subject, we said: "The power may lawfully be delegated to municipalities, to local or to state boards, * * * and when so delegated, the agency employed is clothed with power to act, as full and efficient as that possessed by the Legislature itself."

The primary object in creating such commissions is to see to it that the legislative purpose and mandate are observed and

carried out. This purpose may find expression in enactments directly applicable, or in the legislative adoption of the common law. Whichever way it is expressed, the commission is charged with the duty of making it effective. Such a commission is everywhere held to be a mere administrative body. It is neither legislative nor judicial. I am now speaking of a commission the legality of which is admitted, and using the terms "legislative" and "judicial" in their full, legal sense.

The distinction between legislative powers (in this sense) which all agree cannot be delegated and mere administrative duties, the performance of which is essential to the effectiveness of the law, and which may be delegated, is well shown in *State* v. *Chicago etc. R. Co.*, 38 Minn. 281,—approved in *State* v. *Great Northern R. Co.*, 100 Minn. 445, 10 L. R. A. (N. S.) 250—wherein it was held that legislative power was not delegated to the commission, but that it was simply charged with the administration of the law as enacted. See, also, *C. B. & Q. R.* v. *Jones,* 149 Ill. 361, L. R. A. 141. In *Reagan* v. *Farmers L. & T. Co.*, 154 U. S. 362, 38 L. ed. 1014, Mr. Justice Brewer speaks on this subject with his usual directness: "There can be no doubt of the general power of the state to regulate the fares and freights which may be charged and received by railroads and other carriers, and that this regulation can be carried on by means of a commission. Such commission is merely an administrative board created by the state for carrying into effect the will of the state as expressed by its legislation."

This is the theory of the *Railroad Commission Cases,* 116 U. S. 307, 38 L. ed. 1014, and is the view which has always been entertained by the Supreme Court of the United States. *Butterfield* v. *Stranahan,* 192 U. S. 470, 48 L. ed. 525; *Union Bridge Co.* v. *United States,* 204 U. S. 364, 51 L. ed. 523; *Monongahela Bridge Co.* v. *United States,* 216 U. S. 177, 54 L. ed. 435; *Interstate Com. Com.* v. *Goodrich Transit Co.,* 224 U. S. 194, 56 L. ed. 729; *United States* v. *Grimaud,* 220 U. S. 505, 55 L. ed. 563,— the last named case being a most instructive one. And it is a fact of much significance that, while the power of the Interstate Commerce Commission has been extended from time to time, it has not been invested with judicial power, nor has the Federal Supreme Court ever modified its view that it is a mere administrative body.

Upon such a body, the functions of a court cannot be conferred. *State* v. *Wolfer,* (Minn.) 138 N. W. 315; *George* v. *People,* 167 Ill. 447; *People* v. *Mallary,* 195 Ill. 582, 88 Am. St. Rep. 212; *Louisville etc. R. Co.* v. *McChord,* 103 Fed. 216; *Schoultz* v. *McPheeters,* 79 Ind. 373; *In re Dumford,* 7 Kan. App. 87, 53 Pac. 92; *Hayburn's Case,* 2 Dall. 409, 1 L. ed. 436; *United States* v. *Ferreira,* 13 How. 40, and note on *United States* v. *Todd* prepared by Chief Justice Taney under the direction of the court; see, also, *Interstate Com. Com.* v. *Brinson,* 154 U. S. 447, 38 L. ed. 1047, wherein Mr. Justice Harlan refers to these cases, and says of the statute involved in the Hayburn and Todd cases and which was held to be inoperative: "It thus appears that the Act of 1792, above referred to, attempted to impose upon the courts of the United States duties purely administrative in character."

Moreover, the power of regulation is legislative in character, and in exercising it the administrative body must be classed as a legislative agency.   The particular branch of this power which has been most frequently before the courts is the rate-making power.   *Interstate Com. Com.* v. *Cin. etc. R. Co.,* 167 U. S. 479, 42 L. ed. 243, was a case involving the question whether the Interstate Commerce Commission was invested with power to establish rates.   In deciding that that power had not then been conferred upon that commission, Mr. Justice Brewer says: "It is one thing to inquire whether the rates which have been charged and collected are reasonable,—that is a judicial act; but an entirely different thing to prescribe rates which shall be charged in the future,—that is a legislative act. * * * It will be perceived that in this case the Interstate Commerce Commission assumed the right to prescribe rates which should control in the future, and their application to the court was for a mandamus to compel the companies to comply with their decision; that is, to abide by their determination as to the maximum rates to be observed in the future. * * * The power given is the power to execute and enforce, not to legislate.   The power given is partly judicial, partly executive and administrative, but not legislative. * * * The power to prescribe a tariff of rates for carriage by a common carrier is a legislative and not an administrative or judicial function. * * *"

*Prentis* v. *Atlantic Coast Line R. Co.,* 211 U. S. 210, 53 L. ed. 150, involved the validity of passenger rates fixed by the

corporation commission of Virginia.  The point was made that the courts of the United States could not interfere because the commission was a court within the meaning of Rev. Stat., §720. In rejecting this claim, the court, speaking through Mr. Justice Holmes, says: "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist.  That is its purpose and end.  Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power.  The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind. * * *"

To the same effect is the statement of Mr. Justice Field in the *Sinking Fund Cases*, 99 U. S. 761.  *Atchison etc. Ry. Co.* v. *Denver etc. R. Co.*, 110 U. S. 667, 28 L. ed. 291, was a proceeding to compel one railroad to unite with another to form a through line and for the exchange of business.  The court declined to interfere on the ground that the remedy was legislative rather than judicial.

In *McChord* v. *L. & N. R. Co.*, 183 U. S. 483, 46 L. ed. 289, an injunction was sought to restrain the Kentucky railroad commission from proceeding under an alleged unconstitutional statute of that state to establish maximum passenger and freight rates.  The injunction was denied on the ground that to grant it would be to restrain legislation.  Mr. Chief Justice Fuller, in expressing the unanimous opinion of the court, says: "The fixing of rates is essentially legislative in its character, and the general rule is that legislative action cannot be interfered with by injunction."

The significance of this case should not be overlooked.  From it we learn that while these commissions are held to be administrative agencies, to which these matters may be committed without an unconstitutional delegation of legislative power, their functions are so far legislative in character as to be free from interference in advance.  There can be but one conclusion drawn from the cases:  The delegation of the power of regulation does not and cannot change its character. It remains a legislative function, and the body to which it is committed is a legislative agency—Mr. Justice Bradley in *Railroad Co.* v. *Minnesota*, 134 U. S. 466, 33 L. ed. 970—without whose action legislation is

incomplete and inefficient. It is only in theory and in a technical sense that the orders of a commission differ from a legislative enactment, and the delegation of the power to prescribe rules of this character is to be defended quite as much upon the ground of necessity as on legal principles. "It is not the mode of doing a thing, nor by the pretended capacity in which it is done, but by the nature of the act itself that its propriety or impropriety is to be determined," said Judge Aikens in *Bates* v. *Kimball*, 2 D. Chip. 77. He also drew the distinction between a legislative and judicial act just where it was drawn in the Prentis case above referred to, saying: "That which distinguishes a judicial from a legislative act is that the one is a determination of what the existing law is in relation to a particular thing done or happened; while the other is a predetermination of what the law shall be for the regulation and government of all future cases falling within its provisions." Whether this rule would answer as a test in all cases that might arise, I need not stop to consider,—it certainly is one frequently to be found in the books. Chairman Knapp, whose intelligence and experience add great weight to his opinions, testified before the Committee on Interstate Commerce in the United States Senate, Vol. 4, pp. 3299, 3300, as follows: "To my notion regulation is legislation. * * * A tariff is a law. It is a rule of action of general application. So long as it is in force it has all the characteristics and all the binding obligations of a statute. To depart from it is a misdemeanor, * * * and in the very nature of the case, the proposal to use the methods of a court to deal with a purely legislative question is incongruous and unsuitable."

A moment's reflection will convince anyone, it seems to me, that it is the rule or order of the commission (administrative though you may call it) which alone is of any practical importance to the railroad or the public. It is this which is to have operative effect upon the carrier; it is this which is to accomplish the reform and correct the abuse; it is this which must be obeyed; it is this, the disobedience of which is made penal. Without it legislation is incomplete. Legislation does not end and administration begin until this act of the commission is added to what has gone before. There is an implied confession of all this in the holdings that the commission may be authorized to "fill in the details" of legislation.

So the question here presented is not alone, can administrative functions be conferred on a court, but can these administrative functions be conferred on a court? Or, to state it the other way, can full judicial power be conferred upon such an administrative board?

Let it be borne in mind all along that in all practical senses, —to all intents and purposes,—it is the commission which does the legislating. Theorize about it as much as we may, it must be confessed that its orders so closely resemble and bear such close affinity to legislative enactments that it takes an expert to distinguish between them. For example: The difference between a legislative mandate to erect a gate at a certain railroad crossing and a commission's order to do the same thing cannot be pointed out except by drawing a distinction so subtle as to elude the untrained mind.

Except in the limited and incidental way already specified judicial powers cannot be conferred on such a commission without confusing that which the constitution says shall be kept separate. Whether our Public Service Commission is a court in a judicial sense, depends, of course, not upon what it is called by the Legislature, but on the powers conferred upon it. Such a body is not to be held non-judicial simply because it is called a commission, nor is it to be held to be a judicial body simply because the Legislature denominates it a court. It was said in *State* v. *Wilson,* 121 N. C. 472, 28 S. E. 554, that the railroad commission of that state was an administrative, and not a judicial court, and that while it had been made by statute a court of record, the object was simply to give authenticity to its records and proceedings, as the act added nothing to its duties or powers. But our legislation does not stop there; it goes further; by section 8 of the act in question it confers upon the commission "the powers of a court of record, both at law and in equity, in the determination and adjudication of all matters over which it is given jurisdiction," and the power to issue any process which either of those courts may issue to enforce its judgments and decrees. The majority says it is not a court. If this means that it is not a court because the constitution forbids conferring judicial powers upon such a commission, and that the attempt to do so in this case is unconstitutional, I agree. If it means that assuming the validity of the act it is not a court, I ask why?

What more is needed to make it a court? What element is lacking? It seems perfectly plain to me that it *is* a court. Its functions are, in the respect I am now speaking of, clearly those of the judiciary; they "properly belong" to the judiciary department; they are not incidental, they are primary. If there is a distinction between administrative courts and judicial courts, there can be no question but this commission comes within the latter class. "The award of executions," said Chief Justice Taney, in *Gordon* v. *United States,* 117 U. S. appx. 697, "is a part and an essential part of every judgment passed by a court exercising judicial power."

Within its own domain, this commission is clothed with the most extensive judicial powers; indeed, there is no court known to the law that can do more within the sphere of its own activities than this one can. And it is apparent that it was so considered when we decided *Central Vt. Ry. Co.* v. *Hartford,* 82 Vt. 145; and *Hyde Park* v. *St. J. & L. C. R. Co.,* 83 Vt. 562.

We have here then a court exercising, practically if not technically, the most important legislative and judicial functions in the very same matter. This certainly cannot be, unless the theory of the constitution is to be utterly rejected.

The difficulty is not met by those who say that the commission, being an administrative body, is not exercising any of the powers of which the constitution speaks. The question may well be asked, what is it doing? It is certainly a governmental agency. *Carty's Admr.* v. *Winooski,* 78 Vt. at p. 108. Its powers and authority must come from the state government, and, therefore, must fall into one of the three classes. "No power can be properly a legislative and properly a judicial power at the same time; and as to mixed powers, the separation of the departments precludes the possibility of their existence." *Bates* v. *Kimball,* 2 D. Chip. 77. If we were to hold that this commission as constituted by this statute could stand this constitutional test, then the State Board of Health, Local Boards of Health, State Board of Pharmacy, State Board of Dental Examiners, State Board of Medical Registration, State Fish and Game Commissioner, State Cattle Commissioner, Commissioner of Weights and Measures, and various other boards that exercise administrative functions under the police power, may be invested by the Legislature with equal judicial power and authority

within their respective spheres; they may sit in the judgment seat, issue writs of injunction, mandamus, and perhaps quo . warranto and other process, and exercise judicial authority ''equal in all respects'' to that of the regular courts of the state. Moreover, if this law is upheld, the Legislature can confer this power of regulation of public service corporations upon its own committee, appointed from its own members, and by appropriate legislation authorize it to sit continuously and to exercise these vast judicial powers. Indeed, it may do all this itself. Not only this, but all the duties of all these commissions may be loaded on to the county court, the court of chancery, or even this Court, to the extent of crowding out the exercise of its proper judicial duties.

Nor is this an excursion into the realms of fancy; our table is already spread for just this kind of a repast. There is now pending in this Court an appeal from an order of this commission made in the matter of the Burlington Union Station, taken under No. 288, Acts of 1910, which authorizes us,—and so, of course, requires us—upon hearing, to revise, modify or reverse the order of the commission, and to order the taking of testimony in such manner as we deem best.

The authorities, I confess, are not in harmony on these questions, but the following are in accord with the view herein expressed.

In *Tyson* v. *Washington County,* 78 Neb. 211, 12 L. R. A. (N. S.) 350, it is held that the question whether a drainage ditch will be conducive to the public health, convenience or welfare, or whether the route thereof is practicable, are questions of governmental or administrative policy, and are not of judicial cognizance; and that jurisdiction over them by appeal or otherwise cannot be conferred upon the courts by statute, on account of the constitutional separation of the powers of government,— approving *State* v. *Johnson,* hereinafter cited.

In *Supervisors* v. *Todd,* 97 Md. 247, 62 L. R. A. 809, an act of the Legislature imposing upon a court the duty of receiving and acting on petitions for the submission to the voters of the question whether or not intoxicating liquors should be sold, was void under a constitutional separation of governmental departments.

In *Spencer's Appeal*, (Conn.) 61 Atl. 1010, it was held that a statute giving an appeal from the decision of the railroad commissioners in the matters relating to grade crossings, and providing that the court, on appeal, might re-examine the question of the propriety and expediency of the order appealed from, and, in case the order is not affirmed, may make any other order in the premises that it may deem proper and which might have been made by the railroad commissioners, was unconstitutional. The court says that the acts of the commission are administrative all through, and that the court below, in what it did, was not exercising judicial functions. "They were distinctly administrative, and therefore such as it was powerless to exercise, no matter what authority legislation may have sought to confer."

It was said in *Railroad Com.* v. *Neville*, 96 Tex. 394, that the Legislature had conferred on the court the question of the reasonableness of rates as they affected the rights of railroads and shippers, which was, as presented, a judicial question, and that legislative power was not conferred upon the court. But that "the making of rates by the commission is the exercise of legislative authority, which the court can not exercise."

In *Dewry* v. *Des Moines Co.*, 143 Ia. 466, it was held that a determination by a board of supervisors, that the establishment of the district and the making of the contemplated public improvement therein, is not advisable on the ground that such action would not be conducive to the public health, convenience or welfare, or to the public benefit or utility, is discretionary and of a legislative character, which is not reviewable in the courts, because of the constitutional separation of the powers of government. It is to be observed that it seems that in Iowa they distinguish between constitutional courts and statutory courts, and hold that the latter may be given legislative or administrative, as well as judicial functions. No such distinction, however, exists in this State.

The very question was squarely met in *Western Union Tel. Co.* v. *Myalt*, 98 Fed. 335; and *State* v. *Johnson*, 61 Kan. 803, 49 L. R. A. 662. These cases involved the validity of a statute of the state of Kansas not materially different from our own. They arose about the same time, but the results were reached upon independent reasoning. Both declared the statute unconstitutional on the ground that it sought to confer upon the

Court of Visitation, as it was there called, powers legislative, administrative and judicial in violation of the constitution of the state of Kansas. The opinion of the state court was criticised in the argument before us, but to my mind it is sound, logical and satisfactory.

The limitations upon the powers of judicial bodies in these administrative matters appears from what has been said by the Supreme Court of the United States.

Mr. Justice Brewer, in *Reagan* v. *Farmers L. & T. Co.,* 154 U. S. 362, 38 L. ed. 1014, says: "The courts are not authorized to revise or change the body of rates imposed by a Legislature or a commission; they do not determine whether one rate is preferable to another or what under all the circumstances would be fair and reasonable as between the carriers, and the shippers; they do not engage in any mere administrative work."

That I do not mistake the force of this statement of Judge Brewer, appears from *St. Louis etc. R. Go.* v. *Gill,* 156 U. S. 649, 39 L. ed. 567, wherein it is said in speaking of that case, "The opinion of this court on appeal was that while it was within the power of a court of equity in such case to decree that the rates so established by the commission were unreasonable and unjust, and to restrain their enforcement, it was not within its power to establish rates itself. After recognizing the previous cases as establishing the proposition that, while it is not the province of courts to enter upon the merely administrative duty of framing a tariff of rates for carriage," it was within the scope of their authority to protect the constitutional rights of the carrier.

In the *Express Cases,* 117 U. S. 1, 29 L. ed. 791, in speaking of the action of the trial court in fixing and regulating the terms upon which the railroad company and express company should do business, the court said: "In this way, as it seems to us, the court has made an arrangement for the business intercourse of these companies, such as, in its opinion, they ought to have made for themselves. * * * The regulation of matters of this kind is legislative in its character, not judicial. To what extent it must come, if it comes at all, from Congress, and to what extent it may come from the states, are questions we do not now undertake to decide, but that it must come, when it does come, from some source of legislative power, we do not doubt."

And this is the very ground on which was put *Atchison etc. R. Co.* v. *Denver etc. R. Co.,* 110 U. S. 673, 28 L. ed. 294, and *Pullman's Palace Car Co.* v. *Mo. Pac. Ry. Co.,* 115 U. S. 587, 29 L. ed. 499,—that the court could not make for the parties such a business arrangement as they ought to have made for themselves.

One further question stands for consideration: Are these provisions of the act which confer judicial powers upon the commission such an integral part of the legislative plan as to vitiate the whole act? The majority says that they are not. That is to say, after holding that the case demands a consideration of the constitutional question raised, the majority only goes far enough into a consideration of that question to enable it to say that the provisions attacked can be separated from the rest and the latter stand,—leaving the whole question of whether or not there are any unconstitutional provisions in the statute, and if so, what they are, in uncertainty.

In considering the question of the divisibility of the statute we should look, not only to the structure of the act itself, but to the circumstances which preceded and attended its passage. For many years we had had a commission with more or less authority over the railroads of the state. It was and is now admitted that this was purely administrative and therefore legal. Previous to the passage of the Act of 1906, the commission had practically no power to enforce its own orders, but were authorized, as is the Interstate Commerce Commission and the statutory state commissions to proceed in the courts for their enforcement. I note the fact that the commission in its annual reports had been asking for more power. In the two which preceded the passage of the act in question the commission "recommended" that the whole law be revised and reconstructed so as to strengthen the commission. What the commission wanted was "a law with teeth." The majority says that the primary purpose of the act was to strengthen the administrative functions of the commission. But when *Central Vermont Ry. Co.* v. *Hartford,* 82 Vt. 145, was before us it was considered by the unanimous court that power of enforcement of the orders of the commission was the primary purpose of the passage of the act. This appears from what was said by Chief Judge Rowell in the opinion in that case: "When No. 125, Acts of 1906, was passed, the railroad commissioners had practically no power to enforce

their orders. They had been enforced mostly, if at all, by the Supreme Court on appeal, exercising equity powers for the purpose; and sometimes there was a punitive sanction for non-compliance. When said last mentioned act was passed, though considerable had been accomplished elsewhere in respect of legislative regulation and control of railroads, this State had never conferred sufficient authority upon the railroad commissioners to make them very effective in that regard; and No. 126, Acts of 1906, which, though passed after No. 125, took effect before it, seems to have been the first time the Legislature took the matter in hand with a view to remedy that *shortage of authority* by conferring enough more to enable the commissioners to deal with the matters within their jurisdiction *more effectively and speedily* than they had ever been able to do before. This is evidently why the board is given such ample authority both to judge and *execute its judgments.* * * * * In passing No. 126, the Legislature seems to have had a unified and comprehensive plan in mind, and evidently intended to provide a *singleness of means* to carry it into effect, * * *"

If any further evidence was required to establish the fact that the primary purpose of No. 126 was to confer authority upon the board to carry into effect its own orders, it is to be found in the acts of the same session which had been passed before it. It appears that by Nos. 118, 119, 120, 122 and 125, Acts of 1906, that very Legislature had legislated upon every single administrative matter of any consequence covered by section 23 of No. 126, but had said not a word about authorizing the commission to enforce its own orders. By these acts ample authority over highway crossings, rates, demurrage, furnishing cars, cattleguards and farm crossings, gates, signals and flagmen, connections with other roads, crossing other roads, mortgages, and so forth had been conferred on the commission; and through all this legislation V. S. 3990, as amended by No. 68, Acts of 1902, which authorized this Court, sitting in equity, upon application of the board, to compel compliance with its orders remained untouched. What the status of these prior acts would be if No. 126 should fail for unconstitutionality is a question which has not been discussed, and so I give it no attention.

What "shortage of authority" was there, then? What more power did the commission require in order to deal with

matters within its jurisdiction "more effectively and speedily?" Nothing, to be sure, except the power to execute its own orders. Accordingly, No. 126 gathered up and re-enacted the administrative duties which the board had already been given, and possibly (I cannot say) may have added something of small consequence thereto; doing this as an incident of the grant of the missing power,—the power to put into execution its own orders. Notice, too, that the last section of No. 126 expressly repeals V. S. Chap. 172, which includes section 3990 covering the authority of the commission to go to the court for the enforcement of its orders.   Can it be believed that the Legislature, when it was attempting to strengthen the hands of the commission, would have passed this act repealing the section giving it the authority to enforce its orders through the courts, if it had known that the provision giving the board power to enforce its own orders was unconstitutional and void?

How are the orders of the board to be enforced if that part of the act fails?   It may easily be imagined that a case might arise where the railroad company would prefer to pay the penalty than to comply.   Take the case of the Burlington Union Station.   It involves the expenditure of something like half a million dollars.   The maximum penalty for disobedience of the commission's order is $5,000.   Who can say which the companies will like best?   Can the commission proceed in the courts?   I think not.   Their power is purely statutory, and is only what the statute makes it.   *Rutland Ry. L. & P. Co.* v. *Clarendon Power Co.,* 86 Vt. 45, shows this. A railroad commission is a tribunal unknown to the common law and possesses only such powers as are conferred upon it by statute.   *State* v. *Atlantic Coast Line R. Co.,* (Fla.) 54 So. 394; *Wabash R. Co.* v. *Comrs.,* (Ind.) 95 N. E. 673, and cases cited; *Railroad Comrs.* v. *Oregon R. & N. Co.,* 17 Ore. 65, 2 L. R. A. 195.

Consequently, unless the Legislature has conferred upon the commission authority to do so, it cannot maintain an action to enforce its order.   *Wabash R. Co.* v. *Comrs., supra; Railroad Com.* v. *Railroad Co.,* 26 S. C. 353.

Is there any other way that the court can proceed by way of mandamus or otherwise?   Possibly.   But if there is, its interference is a matter of independent discretion upon full hearing, —quite a different thing than the act in question contemplates.

To me it is utterly unbelievable that a Legislature in an effort to confer more power would have been willing to take a course which would take away what little the board then had. I cannot think that the Legislature would have approached this effort saying ''but from him that hath not shall be taken away even that which he hath.''

It is not the question of what other acts the Legislature would have passed, it is simply the question would they have passed this act with the objectionable provisions stricken out? On this question, the burden of proof, so to speak, is on the act. If it contains one unconstitutional provision, we must be able, in order to save any of it, to say affirmatively that the Legislature would have passed it had they realized that a part would fail. Again I call upon the Supreme Court of the United States for a correct statement of the rule: ''Moreover, even in a case where legal provisions may be severed from those which are illegal, in order to save, the rule applies only where it is plain that congress would have enacted the legislation with the unconstitutional provisions eliminated.'' *Employer's Liability Cases,* 207 U. S. 463.

This Court correctly indicated the primary purpose of this act in *Cent. Vt. Ry. Co.* v. *Hartford, supra.* If the court was right then, the majority is wrong now. For, of course, that purpose has not changed. To me, it seems apparent that the grant of judicial power was an essential and inseparable feature of the legislative plan,—without which the act would be incomplete and inadequate to accomplish the legislative intent, and the whole act must fail. *State* v. *Scampini,* 77 Vt. 92; *State* v. *Paige,* 78 Vt. 286.

I have not reached this conclusion without a keen and appreciative sense of the responsiblity resting upon me; nor have I been unmindful of the rule which requires all reasonable doubts to be solved in favor of the statute. But I also have in mind that other unbending rule that when a statute is in plain conflict with the fundamental law ''it is the duty of the courts to so adjudge, and thereby give effect to the constitution.''

We are living in a time of great political unrest. From one direction comes the call that the government be restored to the people; from another comes the warning that constitutional government is imperiled; from all directions comes the demand,

clamorous, persistent, and not always reasonable, for more and more drastic regulation of public service corporations. It is a time when legislative usurpations may be expected to be more frequent. It is a time for judges to be fearless, and courts to be firm. It is a time for that "recurrence to fundamental principles" which is "necessary to preserve the blessings of liberty, and keep government free."

I am authorized to say that WATSON, J., concurs in this dissent.